OPINION
On September 25, 1998, appellant, Michael K. Love, was indicted by the Lake County Grand Jury for two counts of murder, in violation of R.C.2903.02(A) (B), with a gun specification. The indictment alleged that, on or about August 23, 1998, appellant purposely caused the death of Kenneth Johnson by shooting him with a firearm. The case came before the Lake County Court of Common Pleas for a jury trial commencing on February 22, 1999. At trial, the evidence showed that:
On August 22, 1998, appellant was at a bar named either Hellbusters or Hellraisers in Fairport Harbor, Ohio. Appellant, who is from Cleveland, Ohio, was at the bar as part of a promotional appearance for his rap music group, named Aftamaff. The bar was managed by one of his acquaintances from Cleveland, named Delmarcus Anderson (aka "Peanut"). Also at the bar were the other members of the group and several people he knew from his neighborhood in Cleveland. When he left the bar at closing time, about 2 a.m., appellant got into a car driven by John Turner, one of his friends from Cleveland. John Turner followed at least two other cars toward an after-hours party in Painesville. One car contained Marcus Perkins (aka "Boss"), Tomarve Smith, and Delmarcus Anderson. The other car contained Damon Anderson (aka "Long"), Richard Hayden (aka "Snoop"), Keith Bowles (aka "K.B."), and Jamal Russell (aka "Dred").
As they passed a bar, named Nino's, in Painesville, one of the members of the lead car recognized a person he knew, a man identified only as "Choc," talking to police officers in front of Nino's. Also with "Choc" were Michael Mann and a man identified only as "Squeak" or "Squirrel." The lead car turned around the three at Nino's told them that they had been "jumped" by a group of men from Painesville, including Kenneth Johnson (aka "Dirty") and Antonio Rimmer (aka "Stickman"). They went to an apartment complex in Painesville, known as the Argonne Arms, where the attackers lived. Appellant's car followed.
When appellant and John Turner entered the Argonne Arms complex, they saw "Boss," Marcus Perkins, being chased by a man carrying what looked like a sawed-off shotgun. The man with the gun turned out to be the eventual victim, Kenneth Johnson. Perkins was able to evade Johnson and was picked up by John Turner. At this point, they were attempting to leave the complex when they saw Damon Anderson and Richard Hayden kicking and stomping on a man that was lying on the ground. The man was Ollie Gipson, who later died from his injuries. Damon Anderson got back into the car and Richard Hayden continued to stomp on Ollie Gipson's head. John Turner pulled his car behind the other men's car and they saw Kenneth Johnson running towards Richard Hayden with a gun. Richard Hayden was able to knock Johnson's gun to the ground and the two began to tussle. Keith Bowles testified that he picked up the gun. The passengers of John Turner's car got out of the car, but ducked behind the open doors. John Turner and appellant testified that Johnson pointed the gun at their car, but did not fire. All of the witnesses testified that they heard many shots fired during the events.
John Turner testified that he saw appellant run out of the car and heard shots. He did not see appellant fire a gun, but testified that appellant got back into the car and said to go. Damon Anderson testified that he saw appellant run up to where Johnson and Hayden were scuffling and raise his arm, then he heard a pow, saw a small flash, and saw Johnson stop tussling. Appellant testified that he was very scared during the tussle and found a gun, a .380 left in Turner's car by appellant's brother. He testified that there were lots of shots being fired and lots of confusion surrounding the tussle. He testified that he was holding the gun, but did not point it and that it just went off. According to appellant, he did not realize that he had hit anybody. He testified that: "I'm not saying that I didn't fire it, I'm saying I find it very hard to believe that I killed somebody." He testified that he didn't intentionally fire the gun, but just "clutched up." When cross-examined about whether he fired the gun in self-defense, he answered "no, I was acting in fear."
The bullet entered Kenneth Johnson's left side and exited his left; it was never found. The bullet punctured his liver and severed his superior mesentery artery, which caused him to bleed to death.
As they were leaving the scuffle, Keith Bowles threw Johnson's gun in the trash and appellant threw his brother's gun in the trash. By that time, there were police at the scene. They briefly detained both cars, but let them leave. They all went back to the "keyhole," the dead end of East 117th street in their Cleveland neighborhood. There, appellant told many people that his gun "popped," but he did not know if he hit anybody.
Shortly after the shooting, appellant left the state to tour with his rap group. Damon Anderson retained an attorney and contacted the police to tell of his involvement with the deaths. The police wished to speak to appellant about his involvement, but he was out of state. Appellant learned that his name was "dirty" on the streets, meaning the police were looking for him. He was indicted by the Grand Jury while he was out of the state. He returned and testified that he attempted to contact the police. On October 16, 1999, the police apprehended him after executing an arrest warrant at his girlfriend's house.
On February 25, 1999, the jury found appellant guilty. The trial court sentenced appellant to a fifteen years to life term of incarceration and three years for the gun specification. Appellant assigns the following errors:
 "[1.] Defendant was denied effective assistance of counsel.
 "[2.] Defendant was denied his right to a fair trial and his right to due process of law when the prosecutor's misconduct prejudiced the defense.
 "[3.] Defendant was denied a fair trial by the abuse of the court's discretion when the court instructed the jury on the issue of `flight.'"
 In his first assignment of error, appellant asserts that he was denied effective assistance of counsel because his attorney failed to subpoena certain witnesses, did not properly prepare appellant to testify as to self- defense, and failed to effectively present a self-defense case. To warrant reversal on the grounds that he was not provided the effective assistance of counsel, appellant bears the burden to meet the two-pronged test set forth in Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, which requires a showing of both deficient performance and prejudice.
Appellant's argument fails because he fails to meet the prejudice prong of the Strickland test. The second prong requires a showing that counsel's errors were so serious as to deprive the appellant of a fair trial whose result is reliable. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. A reviewing court, in analyzing an ineffectiveness claim, must view the evidence presented to the jury in toto. Id. at 142, 538 N.E.2d at 379-380, citing Strickland.
Appellant first asserts that his trial counsel was inadequate for her failure to subpoena or call any of six different witnesses. At the end of the trial, she did proffer to the court statements by these potential witnesses from a police report that she argued should have been admitted under the "excited utterance" hearsay exception. Appellant argues that his counsel should have subpoenaed these witnesses and had them testify, rather than attempting to rely on the inadmissible police report.
Appellant is correct that his attorney should have subpoenaed these witnesses in order to have the testimony admitted. However, the failure to have the testimony admitted does not appear prejudicial to appellant. The police reports in question refer to questioning done at the emergency room by Painesville Police officers of friends and relatives of the victims. One woman stated that she saw four to six black males fighting and that Kenneth Johnson was fighting a black male. She had not seen Lisa Dunlap's car, the car in which appellant was riding. Kenneth Johnson's cousin stated that she saw someone holding what she thought was an assault rifle, not a .380 caliber gun. Another witness stated that she heard shots and saw a man she knew as Peanut and heard him say "I'm shooting you, you die next, I know where you live" as he drove past. Another witness flagged down police and told them that a feud had been going on between the men from Painesville and the men from Cleveland over a woman and that Peanut stated "I am going to kill that Dirty [Kenneth Johnson]."
While the above statements would tend to prove that Peanut or someone else may have committed the murder, nothing from the trial supports the statements. Nobody, not even appellant, testified that Peanut was at the scene with a gun. None of appellant's or the state's witnesses testified that anyone in the area besides appellant had a gun pointed at Kenneth Johnson at the time he was shot.
Appellant also asserts that his attorney failed to properly prepare to present a self-defense argument because she had not properly instructed appellant about how to testify and because she did not understand the concept of self-defense. Appellant cannot assert inadequate assistance of counsel due to his own testimony. An attorney's job is not to put words into a witness's mouth, but to elicit truthful testimony. Furthermore, appellant points to an example where the trial court admonished counsel for improperly asking a question by "telegraphing" to appellant what his answer should be. Neither of these are examples of why appellant's counsel was deficient. Appellant's first assignment of error is without merit.
In his second assignment of error, appellant asserts that the trial court erred by allowing the prosecution to introduce testimony regarding appellant's involvement in a rap music group. He argues that this information caused prejudice towards him because rap music is often associated with violence and gangs and that the state had agreed not to introduce such evidence. The trial court determined that the agreement with the state was moot because appellant referred to his status as an entertainer in his opening statement. Whether or not the state and appellant had such an agreement is irrelevant. We cannot say that reference to appellant's involvement was unduly prejudicial. No mention was made of any violence in appellant's songs or violence associated with rap music in general. Appellant's second assignment of error is without merit.
In his third assignment of error, appellant asserts that the trial court erred by giving an instruction about flight. Appellant disputes the following instruction given by the trial court:
 "Now in this case, ladies and gentlemen, there has been evidence presented that the defendant, Michael K. Love, fled from Argonne Arms and then left the State of Ohio. In regard to this evidence you are instructed that flight in and of itself does not rise or raise a presumption of guilt but it may tend to show consciousness of guilt or a guilty connection with the crime.
 "If, therefore, you find that the defendant did flee from the Argonne Arms and then left the state you may consider the circumstances in determining guilt or innocence of the defendant. Upon you alone rests the decision to determine what weight, if any you place upon the evidence you find, if any which bears upon the issue."
 "It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." State v. Williams (1997), 79 Ohio St.3d 1, 11, 679 N.E.2d 646. Appellant argues that there was no evidence that he fled from justice to support the giving of such an instruction. The trial did not state that appellant had fled. It merely stated that there was evidence that appellant had fled, but left it up to the jury to decide whether he had
or not. The instruction was not improper. Appellant's third assignment of error is without merit.
______________________________________ JUDGE JOHN R. MILLIGAN, Ret., Fifth Appellate District, sitting by assignment.
FORD, P.J., concurs, O'NEILL, J., dissents with dissenting opinion.